MyMail, Ltd. v. ooVoo, LLC Search and Media, 2018-17-58. Mr. Buther? Your Honor, good morning. May it please the Court. In this case, the District Court granted a motion for judgment on the pleadings dismissing MyMail's claims based upon the Alice on patentability issue. The District Court erred first and foremost because it failed to conduct a required construction of the claim term toolbar. The specification taught that this present invention, referring to the toolbar, has some unique properties, and then went on to explain that the unique properties included a button bar that can be generated, dynamically changed, or dynamically updated via a pinger process or a mote script. And it is this pinger process, mote script limitation, that is critical, I think, to the entire issue before you. Because that is a limitation that applies to the entire invention, and therefore was very material to determining what is the character of this invention in terms of the abstract idea. The claims themselves, the claims language, it seems to me that it does not require a pinger process. Well, the claim language, yes, does not include the pinger process limitation, but the specification clearly taught that the invention, the present invention, does require the capability or ability to change or update the toolbar software using the pinger process or the mote script approach. This was the construction that the Court found in the Eastern District of Texas. So you agree that there is nothing in the claims? No, this is one of those situations where the specification is definitional, as the PTAB found in the two IPR proceedings, and therefore that definition specified and dictated in the specification, that limitation, has to be applied to the invention as a whole. When you say the present invention, unless there is some... That may be the case if the limitation is somehow claimed, if it is in the claims, but as you say, there is nothing in the claims here that that limitation, the pinger limitation, is not referenced and is not disclosed in the claims. Not directly, but the word toolbar, of course, is referenced throughout the claims, and the specification teaches that the toolbar must include this capability. Why then would we read into the claims the pinger process? What was the question? Why would we read into the claims a pinger process? Because the inventors expressly stated that the claimed toolbar, which is in all of the claims, has unique properties, and using the word the present invention, the toolbar has unique properties. Why didn't they write in the pinger process? Good question. I thought about that. I think that the language, you know, generating, updating with a pinger process mode script is a bit awkward. I mean, I'm speculating. I didn't draft the claims, but I think that the inventors used the specification to define the term toolbar, as you're allowed to do, and that by necessity you look to the specification to see what kind of a toolbar we're talking about, and the specification couldn't be clearer that the toolbar had to have this pinger, well, had to have the capability of updating or modifying a toolbar using this pinger process, and so I think that probably, again, I'm speculating, but the reason... The specification says the pinger entity may be part of the access service provider, or it may be separate. It will be assumed to be part of the access service provider. Well, the pinger can be anywhere within the system. It can be on the client side or on the server side, but wherever it is located, figure 16, figure 20, and the three-column description of the pinger process says one thing for certain, that the claimed toolbar must have the ability to be updated or modified using this pinger process and mode script, and this is not just a nonce word, if you will. The specification goes on for some length and detail about what this pinger process and mode script involves, so this is not a sleight of hand of any sort. I think the inventors clearly intended to limit the claimed toolbar to a toolbar which has the ability to be updated using the pinger process, and rather than putting that long language in the body of the claim, use the definitional approach, which is proper, to give meaning to that word toolbar, and as the... I'm sorry. Why doesn't the... How does the pinger process make this not abstract? Well, because what it does is it provides a non-generic, a non-conventional improvement in the way that toolbar data is updated. This is not a situation where the claiming is purely functional, and it doesn't matter how you update the toolbar or modify it. We're just claiming the result, if you will. There's other ways to update a toolbar, correct? Well, there are. In fact, I mean, this is the first time toolbars are being updated, but they did not involve this automatic dynamic process using the pinger, where once the Internet device is connected through the... or the Internet device is connected to the server. See, that's your problem. There's other ways to update the toolbar. Yes. And what you argue is unique here, or the innovative, is the pinger process, but yet the claims don't claim the pinger process. Well, they do. It has to. The accused device... You said no to my questions. I'm sorry? The pinger process is not claimed within the claims. Well, I guess maybe that's a semantical issue, but if the patent teaches that the word toolbar means that it must have these unique properties... Well, the written description may mention the pinger process, but I was asking you, and I'm talking about the claims themselves. The claim language does not mention the pinger process, yes, but this court has on numerous times in claim construction narrowed the scope of a broader term by what the specification teaches it must have. And in this case, the specification is abundantly clear that the toolbar, as claimed, must have the ability to perform this updating or modifying using the pinger process. So, I mean, there are many claims that require a capability, but that's not the only way it must be done. I mean, Intel, other cases which involve this capability language. So, the fact that it can be done other ways doesn't mean it's not a meaningful limitation. The bottom line, as the PTAB found, is that the toolbar has to have the ability to do it the pinger way, and it can do it other ways, but if it doesn't have that ability, then it doesn't infringe. But as long as it has that ability, it can meet that limitation, and that's the... Let me ask you a question about the function of the pinger process. Who or what enables that? The way I read the RIN description, it's the ISP. The server side is where it can be implemented, but the patent doesn't require it to be in one location. If you look at figures 20 and 16, the pinger, which is set forth as a separate entity, does not have to be part of the client side. It can be. It does not have to be part of the server side. It can be. So where the pinger is located, it can be in more than one location. It doesn't have to be at the ISP. It could be at some other location. It doesn't specify that, but the limitation still exists. And so to address your concern, yes, the words don't exist in the claim language, but this Court has frequently narrowed the scope of claim language when the specification says that has a special meaning, and therefore that has to be read into the claim language by implication. So I believe that that's a proper limitation, as the Eastern District Court found of Texas and the PTAB. And at this pleading stage, the District Court was required to either accept our proposed construction, which was not only plausible, but we believe correct, or do its own claim construction, at least to resolve this issue for ALICE purposes. The District Court did not do that. The District Court, for whatever reason, didn't address the claim construction issue. And that really was the flaw that led to the rest of the District Court's opinion being erroneous. Because once you ignore that limitation, well, then the claim seems more abstract. But as I said, because this invention involved the improvement of a process for updating a toolbar, that was improving the functionality of the computer system and the server system. This was not merely using a computer as a tool doing its generic routine functions. It was not merely functional claiming without explaining how to get to the result of updating. It provided a very specific way that capability had to be there, with significant technological details about what this PINGR process involved. It had to have a heartbeat service. It had to have an authentication service. And it also had to have the updating service. So this was not merely updating software or toolbar software by whatever means you choose. Even the District Court recognized that, quote, the focus of the claims is on the process by which the toolbar is updated, close quote. District Court was absolutely right on that, but where the District Court erred was ignoring the PINGR process limitation, which meant it was not just any process. It was this specific process that the capability had to be there. And so when the District Court, I hate to use the word ignored, but didn't address the PINGR process limitation, then its analysis kind of collapses like a house of cards. Because once you acknowledge that this is not merely directed at updating software, but it's directed at updating software in a very particular way, that's not an abstract idea. And then even if one were to characterize the patent as directed to something more high level and general, the PINGR process limitation, I think, clearly supplies the inventive concept necessary to satisfy step two of the Mayo test. Once again, this is a problem rooted in computer technology, automatically dynamically updating software. And it's a solution that is technological in nature. And these claims as limited involve a specific and unconventional application of updating a toolbar and not just any method. And there is simply nothing in the record to show that the PINGR process is something that was well understood or routine or conventional at the time of this invention. And remember, this invention was conceived in 1997 at the very infancy of the Internet and these types of systems. This court says that the affirmative defense in this situation, basically the patent has to conclusively concede the routineness or that it's well understood whatever process is being claimed. There is nothing in the patent that suggests that the PINGR process was routine. In fact, it says just the opposite. It says it's got unique properties of this nature. Counsel, do you want to say something? I will. I'm already a minute into my rebuttal, so I'll thank you for reminding me. Thank you. Mr. Hales. Thank you, and may it please the court. We have a very different view of the district court proceedings than my mail does. My mail never asked the district court to apply a claim construction for toolbar in its pleadings. If you look at Appendix 738, they summarized the claims for the court on Alice Step 1. They said that modifying the toolbar data over a network by adding a toolbar button or otherwise updating toolbar data without user interaction accurately captures the character as a whole. There was no ask by either party to perform any kind of claim construction. And we think this is all basically a new argument. If you review the briefs, both at the district court and through to the reply brief, I think you'll see that this proposed construction of toolbar is a moving target. When they summarized the idea of the PINGR to the district court, they gave them three features. Those three features are the same features that appear expressly later on in the claim. You would ask, is the PINGR reflected in the claim? We don't think the PINGR is reflected in the term toolbar. But these steps of communicating from a client device, it's called a user internet device in the claim, to a server, the server making a decision, are you going to get an update, and the update coming back down, that's a summary that they provided in a footnote. I think it's on footnote 5 of their brief to the district court. That's what they thought a PINGR was. And that is redundant to steps that appear elsewhere in the claim. For written description purposes, those steps that appear expressly in the claim harken back to the PINGR. We don't see that this claim or any of the claims on appeal bring in the entirety of a PINGR. So you're saying if the claim as written is abstract, interpreting it to have a PINGR doesn't make it less abstract? We do think that this idea that PINGR somehow infuses a non-abstract quality is wrong. That's absolutely correct. And there are problems throughout the MIMO briefing. One of the things that they say is, so first they say that the district court refused to adopt the construction. There was no refusal because there was no ask to adopt the construction. The second thing they say is, well, if the district court had adopted the YAHOO construction, everything would have worked out great. But that YAHOO construction by its terms says that this term toolbar can be, not must be, but can be updated by a PINGR or by the MOT script or by something else. There's a catch-all exception that swallows the whole in the YAHOO construction, which means that this is not limiting it at all. It could be A or B or anything. That doesn't make it non-abstract, particularly on an ALICE analysis. The YAHOO constructions, the relevant pieces are at the appendix at 764. They declined to interpret can be as must be, and that's at 773-74 in the appendix. So you're a district court, right? And they've summarized the claims character for you. They don't talk about PINGR at all. They talk about adding buttons or changing buttons. And if you're a district court, I think you respond and you analyze the claims at that level. All of the stuff about how this is a critical construction and those kinds of things are things that are being raised for the first time on appeal, really. They didn't talk about the PINGR, but they talked about it only obliquely. They talked about it as being an embodiment of the specification. They talked about it as being, there is one statement that says- Was the scope of the claims ever in dispute? No. Again, neither party offered a construction. No, that's right. It's not. And again, their pitch, their sales pitch to the district court was adding a button or changing toolbar data. That's the thing that made it non-abstract. And that was the thing that was driving the ALICE analysis before the district court. That's gone. It's not been raised on appeal. And now we're talking about something new. We're talking about how this Yahoo construction somehow changes the character of the claim. We think that's wrong. So your opponent says we have to read into the claims the language about the PINGR that's in the written description. Do you agree with that? I do not. And again, I think if you look, you compare the description in their footnote at the district court, it actually mirrors claim language that appears expressly in the claim. If a PINGR does nine things and you talk about three of those functions in a claim, that indicates that the other six are not there. And that's this kind of situation. Heartbeat services and authentication services, that's all newly raised at the reply brief stage. That was not argued to the district court. It's certainly not in the claim. The claim talks about a user Internet device will send a revision level to a server. The 070 patent has this litany of 21 other or 21 things. The server will make a decision and the update comes back down. And that matches the summary that they provided to the district court in that footnote. And again, in our view, that's ordinary stuff. In our view, if you're going to find out whether your software is out of date, you're going to look at the revision level. I think we gave a Windows 95, Windows 98 version. You can call down to your IT shop and say I'm running Windows 95. And they say, nope, you're out of date. Or the personalized media case. Judge Andrews from the Delaware District Court said it was like checking the Federal Rules of Civil Procedure. If I'm running the 2017 or 2018 version, my library tells me, yeah, you're out of date. You need a new copy. And they send me the new copy. These are straightforward techniques. The techniques that are recited in the claim affirmatively are straightforward. They're the kinds of techniques you would expect to be done sort of at a brick and mortar is the wrong term. But it's some type of manual process level. And they show the abstract nature of this claim. All right. So are there any questions? I got myself a little derailed. Back on track. Let's see. Okay. Step two as well. They were talking about before the district court, adding buttons or revising buttons. Page 745 of the appendix. Again, I don't want to overstate it. They did bring up the pinger concept before the district court. But they were characterizing it as a teaching of the specification. They were talking about embodiments of the specification. They did say that the Yahoo construction somehow infuses a technical character to the claim. I think that's clearly wrong. But these are just not issues that the district court needed to address in deciding this issue. Another thing I'd like to point out is these claim elements, again, their summary of the pinger appear expressly in the claim. And the district court got that. The district court looked at those issues as they appear expressly in the claim and decided that this case looked like the personalized media case. The personalized media case is a case from Delaware that was affirmed by this court. It was a case where a computer has version 1. I think they call it a specific version in the claim. And they received something called a designated version. And they compared them. And they decided, are we going to update software? That's exactly what's happening here. And these three features that they provided in their summary in that footnote are the same features that were in the claim. And those features drove the district court to decide, hey, this looks like the personalized media case. This isn't a swing and a miss. It's not like the district court didn't see it. This is something where the district court actually saw these claim elements sitting in the claim expressly. And it drove the district court's decision correctly, we think. Just a couple notes. There were no factual issues in dispute. This is not a Berkheimer situation or an Atrix situation. No pleadings and allegations in the complaint. No expert declarations. No need for discovery cited in district court briefing. The PTAB decisions to which Maimel refers all happened after the district court's decision. So the district court's decision predates those. And we just really think this doesn't move the needle at all. And just to be sure, was there or was there not a claim for, rather a request for a claim construction? No, there was not. At best, there's also another footnote. Let me see if I can find it in my notes. Page 734 of the appendix, they had a footnote 8 in their brief suggesting that the entirety of the Yahoo claim construction order demonstrated that the plausibility of constructions. But in our view, that's an invitation for the court to go hunt through this, whatever, 35-page claim construction order to find things on its own. All right. What else can I tell you? Anything else? No, if that's it. If not, I'll sit down. Thank you. Mr. Guther has some rebuttal time, three minutes. Mr. Guther, if we don't read the Pinger process into the claims as you'd like for us to do, then is your pen abstract? It's a very difficult case for us to win without that limitation, yes, Your Honor. But we specifically pointed the district court to the claim construction ruling by the Eastern District of Texas on appendix 740. You never did seek a claim construction? Yes, we did. We clearly said on page 14 of our brief at appendix 740, we said, indeed, the construction by the court in the Eastern District of Texas of the term toolbar, which is used throughout the asserted claims of the 070 patent, as a button bar that can be dynamically changed or updated via a Pinger process remote script, confirms that the claims of the 070 patent are directed to a particular technological process for improving an exclusively computer-oriented device. We didn't say, and please construe it this way, but I don't think there's any other reasonable way to read that language. And that wasn't lost on the defendant. They spent three pages arguing why the court shouldn't apply that claim construction and why it was erroneous and why even if you do construe it this way, it somehow shouldn't matter. And so we clearly pointed... Wouldn't it matter because that's how you put the scope of the claims into dispute, by making exactly those type of statements, by requesting claim construction or arguing that this is appropriate construction applicable in this case? That's what we did. I didn't hear that in that footnote that you were reading. Well, we specifically referred to the construction by the Eastern District of Texas as confirming our key argument on patentability under Section 101. And we attached, as Exhibit A, to our response to the claim construction ruling of the court in Texas. And then, as I said, the defendant spent two and a half, three pages arguing why the court shouldn't adopt that claim construction ruling. And so I think it's... The court was clearly on notice that the PINGR process was a relevant issue. In fact, in its description of the technology, the court mentions that the PINGR process was an essential part. It said... Let's see if I can find that. Excuse me one second. Here we go. Where is it? Oh, here it is. It said that the device executes software called a client dispatch application that initiates a PINGR to update the toolbar database along with other databases. This was the court describing the invention for the purposes of the Alice analysis. So we clearly put the court on notice that critical to the interpretation of the scope and the character of the patent was the PINGR process construction, which the Eastern District of Court imposed and which later the PTAB imposed in two separate cases. So this is not... I mean, the waiver principle requires that the district court basically had no notice that you were making the argument. Our argument here on Appendix 740, we attached the claim construction ruling and then the defendants not only making the claim construction arguments to the contrary, also attached our brief that we filed in the Yahoo case in the Eastern District of Texas. So we could have said, please construe it this way, but I think clearly we were arguing that this construction gave the term toolbars some specific meaning, which clearly underscored that the patent was claiming a very specific process for updating the toolbar and not just any process or a generic process. As you see, we have a pinging red light. Am I already over? I apologize, Your Honor. I think we'll take the case to your department. Well, I'm now updated on the time available. Thank you. Thank you.